students their impressions of your questionable conduct, in an effort to try to convince students that your conduct was acceptable, when in fact it was not (e.g., your taking off your belt in class).

## C.   Margie Santoyo Student Complaint

80.   On March 31, 2011, the District received a formal written complaint against you, filed by student Margie Santoyo from your English 118 class, alleging discrimination on the basis of age, gender, mental and physical disability, national origin, and retaliation. The District conducted a formal investigation, through an outside investigator.   The investigation into Ms. Santoyo's complaint established that you loudly and insensitively asked Ms. Santoyo about her disability, which could be overheard by others.  Student Alexandria Brown corroborated that you and Ms. Santoyo had a discussion in front of the class on February 14, and that she heard the word "disability" stated.  You admitted that you asked Ms. Santoyo in class what her disability was.   Your behavior in querying Ms. Santoyo in the classroom regarding the nature of her disability was unprofessional and out of compliance with the directives set forth in the DVC/DSS Faculty/Staff Handbook.  You admitted that you had not read the Handbook and did not even know it existed.

81.   The investigation into Ms. Santoyo's complaint also established that you inappropriately responded to an email inquiry about her accommodation.  Ms. Santoyo emailed you on February 8, 2011, advising that she was a Disability Support Services ("DSS") student and asking you to fill out a test Proctor form in the event tests were being given in class.  She emailed you a second time on February 9, 2011, after you failed to respond to her first email.  On February 10, 2011, you responded, telling her to bring in the form and adding that you needed to discuss her "classroom behavior."  You made no reference or inquiry regarding her DSS status or her accommodations.  Instead, you made what Ms. Santoyo perceived as a disturbing remark about her attendance in your class. (Exhibit 24.)

82.   During a meeting on February 23, 2011 with Ms. Santoyo and Ms. Deason to discuss Ms. Santoyo's complaint that you were harassing her in class, you placed the focus of the meeting on what you perceived as Ms. Santoyo's failure to learn the class material and essentially cross-examined her in a hostile and aggressive fashion.  For example, you said, "Margie, do I even know how old you are?" and "Margie, there are other older women in the classroom, do I treat them differently because they are older?"

83.   The January 28, 2011 NUC/NUP warned you that the District would institute disciplinary action against you, up to and including dismissal if you failed to correct your performance during the 90-day period following issuance of the Notice, and thereafter.  Despite all of the warnings and directives you have received, you have been unable to correct your inappropriate behavior toward your students.  Although you were specifically directed by the February 22, 2010 Letter of Reprimand and the January 28, 2011 NUC/NUP to treat your students with respect, the investigation into Ms. Santoyo's discrimination complaint established that you engaged in unprofessional conduct toward Ms. Santoyo between January 24 through February 28, 2011, by treating her in a belittling, degrading, and humiliating manner in the classroom, through an email correspondence, and during a February 23, 2011 meeting with Ms. Santoyo, all of which contributed to a hostile environment based on disability.

Paul Guess
Statement of Charges
005142.00172/321121v1

84.     In addition to the Santoya complaint, on September 15, 2011, student Roger McCool, who as a student in your Spring, 2011 ENGL 126 (critical thinking) class, called dean Ellen Kruse to orally complain about your failure to implement his requested accommodation of a notetaker, and other issues.  When interviewed, McCool reported that during the first session of class, he approached you regarding his request for a notetaker, to which you responded that you did not believe in notetakers, that you believed all students should be judged based on their own abilities, and that providing a notetaker for some students was not fair.  As a result, McCool was deterred from pursuing his request for an accommodation for a disablity.  He continued in the class for approximately two more sessions, but ultimately felt compelled to drop the class.  His impression was that you were not intersted in the students' opinons or views, lacked compassion and did not care about students.  McCool felt compelled to complain after recently overhearing several other students talk about their negative experiences in your class, and his belief that you did not belong in the teaching profession.

## D.     Lack of Cooperation With Management-Initiated Evaluation

85.     The January 28, 2011 NUC/NUP, required you to submit to a management-initiated evaluation pursuant to Section 17.3 of the collective bargaining agreement between the District and the United Faculty.  The evaluation was based on evidence that you were in violation of Education Code section 87732.  A pre-observation and post-observation evaluation meeting was scheduled for March 29, 2011, at 3:30 to 4:30 p.m.  You unilaterally rescheduled for 4:30 p.m., said you were stuck in traffic, and kept management and the United Faculty representative waiting until 6:00 p.m. without providing any updates.  Management found you at 6:00 p.m. in your office.  Your behavior was unprofessional and inappropriate.  Based on the misconduct, you were given a formal letter of reprimand, dated April 12, 2011.  (Exhibit 25.)

86.     The January 28, 2011 NUC/NUP, directed you to submit to a management-initiated evaluation.  You attempted to sabotage the evaluation process by changing meeting dates scheduled by the administration.  For example, on March 24, 2011, you stated that you could not make a pre-scheduled meeting time for March 29, 2011, and admitted that you should have "protested" earlier.   On March 29, 2011, the administration chose the division representative on the Evaluation Committee.  You objected to the selection and challenged the management evaluation process.  You were asked to choose your own representative on the Evaluation Committee but failed to do so in a timely manner.  You also failed to provide Classroom Observation Plans, hindering the process.  (Exhibit 26.)

## E.     Results of Management-Initiated Evaluation

87.     Nine classroom observations were conducted as part of your management-initiated evaluation.  Your English 118-8744 class observation was conducted on March 7, 2011.  You failed to provide a copy of the Classroom Observation Plan to Vice President Lamb, as required.   At the beginning of the class, you introduced Ms. Lamb as "Suzie" in an unprofessional and demeaning manner.  You were scored by observer Susan Lamb in 16 categories.  You were rated as "poor" or "below average" in seven of the 16 categories.  You initially refused to allow Ms. Lamb to conduct the student evaluation at the end of class. Despite the clear directives that you had been given in the past, you repeatedly used student nicknames throughout the class, e.g., "T.P.," "Prince Andrew," "Jedi Knight," etc.  Moreover, despite

Case 4:12-cv-02829-YGR   Document 77-1   Filed 06/03/16   Page 3 of 13

directives not to use gender-based or flirtatious language toward students, such as "baby," you also presented a "Beautiful Baby" award to one of the female students, who was obviously embarrassed and blushing. Ms. Lamb also noted that only 12 out of 19 registered students were present. Your course syllabus was so minimal that it did not give students a clear understanding of the course expectations and was incomplete. It contained only four specific office hours, even though five are required under the contract. The syllabus also did not sufficiently put students on notice of your grading policies. Lastly, it was noted that your census rosters were late for all classes, and you had not been attending the meetings of the College's EEO committee of which you were a member. (Exhibit 27.)

88.    Your English 118 syllabus for this class contains several typographical and/or grammatical errors, including a missing comma in the first sentence, in the second sentence of the fourth paragraph, and the first sentence of the fifth paragraph. The second paragraph uses the term "must be doubled [sic] spaced" with reference to typing of the essays. There is improper use of the colon. While you note that 25-30% of the student's grade is based on mastering sentence skills, the syllabus fails to outline how the remaining 70% of the grade is calculated.

89.    Dean Ellen Kruse sat in to observe your English 126-8772 class on March 15, 2011. Ms. Kruse gave you 6 ratings of "below average" and 5 ratings of "poor." Ms. Kruse noted that you arrived right at 7:00 p.m., the time the class was supposed to start, and that you had not put the agenda on the board or gone over the evening's objectives. She noted that you used class time to grade papers while discussing the papers with students, which was not an effective use of class time. She noted that you failed to provide a Classroom Observation Plan, as required. Many students received no direction while you went over papers with the other students. She noted your overemphasis on group work, and that your grading system was unsuited for numerous students' learning styles. She also noted that despite previous directives, you continued to use student nicknames, such as "lovely in pink" and "beautiful in purple," which was inappropriate and flirtatious. She noted that student comments revealed that some felt "pick[ed] on," scared, and disrespected. Student comments noted that there were still issues with you embarrassing and humiliating them. She noted ongoing problems with student retention (a drop from 36 enrolled at the beginning down to 12 attending on the night of the observation). She noted that your syllabus failed to adequately inform students of your grading policies, including such verbiage as "you are graded on the type of student you are…" The syllabus also failed to reference the objectives of the course outline or student learning outcomes, as required. It failed to advise students of the requirement for students to write 6,000-8,000 words during the semester, and that the requirement of one take-home essay was unlikely to meet these requirements agreed upon with DVC's transfer institutions for critical thinking courses. She also noted that the syllabus listed only four, as opposed to the five required office hours, and your ongoing failure to timely submit rosters and grades to the Admissions and Records department. (Exhibit 28.)

90.    President Peter Garcia came to observe your English 122-8623 class on April 6, 2011. He rated you as "poor" in three categories, and "below average" in five categories. He noted that you continued to use student nicknames, such as "ever laughing." You needed to leave your classroom shortly after the scheduled start time because you had forgotten to bring the movie you were going to show. However, you ended up never showing the movie, indicating a

Paul Guess
Statement of Charges
16                                          005142.00172/321121v1

lack of organization or adherence to objectives. The learning outcome was never clearly stated. The classroom discussion lacked structure. Mr. Garcia also noted that you made reference to a male student either dressing or appearing "gay," ostensibly to make a point about stereotyping. However, you never closed the loop on this activity with regard to your reference of the particular student, and in a somewhat lame attempt to ensure that you did not think he was or was dressed "gay," you told him that he was "all man." Of course, this left the impression that you perceived someone who was or dressed "gay" as "not all man," which was offensive. The student said that he was a "nerd," which in turn led to other students discussing him, and the conversation was awkward and chaotic. Mr. Garcia noted that there was very little content in the course outline, that you canceled the pre-evaluation meeting, and made no effort to reschedule it. You also failed to provide a pre-observation form, as required, and that you had not attended the most recent department meeting. (Exhibit 29.)

91.     Notably, your syllabus for English 122 contained several typographical or grammatical errors. For example, in its reference to "a five concept lexicons" [sic] you were presumably referring to a singular "lexicon," and should not have made the word plural. Alternatively, you were referring to five "lexicons," in which case you should not have used the word "a." The next sentence appears to inadvertently omit the word "a" in front of the phrase, "sentence/structure/grammar test." The fifth paragraph, second line from the bottom appears to be missing the word "class" after the word "miss." Lastly, your grading policy was incoherent. You indicated that the "lexicons" were worth 40% of the grade, the test was worth 10%, and the final essay was worth 50%. However, you also indicate the "class participation" and attendance would count toward the grade, but it is unclear to what degree, since 100% of the grade was already accounted for by the previous three items listed. All of these issues make your syllabus confusing and unclear. Lastly, the syllabus fails to outline five scheduled office hours.

92.     On April 13, 2011, faculty member Laury Fischer and Vice President Susan Lamb observed your English 175 class. While 25 students were registered, only 16 were present. Ms. Lamb noted that after taking roll, you asked the students what they wanted to work on, and you failed to delineate a specific objective. You failed to provide a Classroom Observation Plan, as required. Despite previous directives, you held students 10 minutes after the class was supposed to end, and students noted that this was a common practice. Holding the students late also frustrated the observers' administration of student surveys. She noted that when a student disagreed with you about the subject matter presented, you informed the student that she obviously did not understand the information, and moved on to the next student, who agreed with the first student. Rather than address the fact that two students disagreed with your interpretation of the material in a supportive and educational manner, you changed the topic. Ms. Lamb noted that the class syllabus was incomplete, as it listed only three out of the required five office hours, and failed to describe grading standards. Lastly, she noted that you had turned in your census rosters late for all of your classes that semester, and for the previous semester in 2010. (Exhibit 30.)

93.     During the class, you included sexual terminology (such as "penis" and "breast"). You also used sexually provocative "prompts," such as falsies and brassieres, without having obtained advance permission, as required by previous directives. While the use of these sexual terms or "props" was not necessarily inappropriate, given the context of the discussion (relating

to images from modern science fiction movies to Jung's psychological constructs of animus and anima), you nevertheless clearly violated the previously given directives, constituting insubordination. (Exhibit 30.) Ms. Lamb issued a formal letter of reprimand for your misconduct following the observation.

94.     Faculty member Laury Fischer also noted deficiencies in your course syllabus and the lack of clarity in your grading policies. In fact, the syllabus is entirely unclear. While Units One and Two are apparently each worth 20% of the grade, the syllabus fails to outline what percentages are assigned to the other three units, whether there are tests, essays, or other methods used to assess student learning. (Exhibit 31.)

95.     While not expressly noted in Mr. Fischer's observation summary, the syllabus also contains grammatical and/or typographical errors, such as missing commas and misuse of the colon. The first paragraph uses the word "notice" instead of "noticed." The word "throughout" is misspelled in the second paragraph. There is an inappropriate use of the apostrophe "s" at the end of the description for Unit Three. The description of the assignments appears to be identical for each unit, which is very confusing. In addition, texts are cited inconsistently. In some cases a book title is italicized (as it should be) and in other cases it is not. Correctly citing sources is an important part of papers in literature courses, so the syllabus fails as a model of correct citations. Given that you have frequently defended your harsh grading and high drop-out rate on the failure of students to "meet your standards," these sorts of errors stand out.

96.     On May 3, 2011, President Peter Garcia and Laury Fischer observed your English 126-8772 (critical thinking) course. It was noted that only 12 students were enrolled, far below the number required to maintain a course through the entire semester, and that at the beginning of class, only four students were present, although four others arrived later. Mr. Garcia rated you as "below average" in eight categories, and "poor" in one category. You failed to articulate the objective for the class, and did not connect the material to learning outcomes. The handout was poorly copied, and you spent much of the class reading aloud from it. Again, you failed to provide any required pre-observation form to the observers. It was apparent that the material covered was not what the students expected, and they did not understand the purpose of the handout. Mr. Garcia also noted that when students made comments that you did not agree with, or which you found off the mark, you would raise your hand in an aggressive manner and state loudly "stop!" in an effort to cut off the students in an abrupt and unpleasant manner. This occurred at least five times. You informed one student, Frank, in front of all the other students, about the significant shortcomings in his most recently graded, but not returned paper. Both Mr. Fischer and Mr. Garcia also noted that during an unplanned discussion of child rearing, one student noted that she never spanked her child, while another noted that she occasionally "swats" hers. You referenced this student's use of "corporal punishment" and told her that "a body of research" indicated that this technique indicated she might have to make a choice between "obedience" and "brightness." The implication was that the student was "wrong" and that it was somehow proven that occasionally spankings reduced intellectual development. According to both observers, the student appeared upset by your verbal judgment, and stopped talking thereafter. Given that the course was about critical thinking, it would have been far more appropriate to discuss the various viewpoints on this

practice.  Your conduct in this instance clearly violated the previous directive given to you in the NUC/NUP not to make judgments about students' life choices.  Both observers noted that your syllabus was unclear, did not adequately describe grading policies, and did not list the requisite number of office hours.  (Exhibit 32.)

97.     On May 11, 2011, Dean Ellen Kruse and faculty member John Thomas conducted an observation of your English 122-8623 class.  Ms. Kruse rated you as "below average" in five categories, and "poor" in four categories.  Both Ms. Kruse and Mr. Thomas noted that you failed to submit the required classroom observation form.  Ms. Kruse noted you failed to introduce the two observers and did not initially state the objectives of the day's lesson.  She noted that you failed to connect the various exercises together or to provide a Classroom Observation Sheet which explained the lesson plan.  She noted that by the end of the semester, students should be working on more complex tasks than an organization exercise.  She noted that numerous students complained about your ongoing demeaning treatment of students, despite previous directives.  Both Ms. Kruse and Mr. Thomas noted problems with your course syllabus and lack of clarity in grading standards, failure to inform students of the requirement to write 6,000 graded words, and failure to include all five required office hours.  (Exhibit 33.)

98.     Student survey results indicated serious deficiencies and ongoing failure to comply with previously given directives.

99.     In your English 126-8772 class, a third of the students thought you "rarely" or "never" started and ended class on time.  Another 17% thought you only "sometimes" did so.  A quarter of the class thought there were issues with you treating students respectfully.  One student commented that you singled people out in class and tended to make them feel embarrassed.  Another student wrote, "Don't pick on us."  Two thirds of the class thought there were issues with you returning papers and tests in a timely manner.  (Exhibit 34.)

100.    In your English 122-8623 class, only 29% of students believed that you "always" started and ended classes on time.  More than half the students felt there were at least sometimes issues with organization and clarity.  Only 48% of students felt that you "always" treated students respectfully, meaning that most students felt that you did not treat all students respectfully.  Twenty-four percent felt that you "never," "rarely" or only "sometimes" treated students respectfully.  Less than half the students felt you "always" returned papers and tests in a timely manner.  Student comments included complaints that you were sarcastic, made fun of certain students, graded too harshly, encouraged students to drop the class, and reprimanded students in a disdainful and severe tone.  (Exhibit 35.)

101.    In your English 118-8744 class, student survey results also indicated problems with your beginning and ending class on time.  Over half the students felt you did not answer questions clearly.  Additional concerns were raised about treating students respectfully.  Only 18% of students felt you responded clearly to them when they needed help outside of class, and/or responded clearly.  Student comments included one about the need to lower your ego and not put students down, the need for treating students with more respect, and not making them feel stupid.  (Exhibit 36.)

Paul Guess
Statement of Charges
005142.00172/321121v1

102.     In your English 175-2742 class, student survey results indicated that over 90% of students felt there were ongoing issues with you beginning and ending class on time. Students commented that you regularly ran the class 15-30 minutes past the end of class. Only 26% of students felt you were always organized and taught clearly. Only 21% of students felt you always answered questions clearly. Only 32% felt that you always outlined to the class at each meeting what students were going to be learning. Only 37% felt that you always treated students respectfully. Less than half the students felt you always responded to their work so they knew how they were doing. Only 37% of students felt that you always responded to them if they needed help outside of class. (Exhibit 37.)

103.     When reviewing the student survey results, it must be kept in mind that these results are only from students who actually stayed in the class. Had the students who dropped your class been surveyed, it is likely that the comments and ratings would be even more negative.

104.     Despite past directives, you have failed to make adequate improvement in increasing and improving student retention. In your English 118-8744 class, a total of 30 students enrolled. Fourteen withdrew, and only 16 finished the class (53%). Only seven (23%) were successful (i.e., received an A, B or C), and 76.7% of the students either dropped, or received Ds or Fs. In your English 122-8623 class, a total of 39 students enrolled, but only 24 (61.5%) finished the class. Only ten (25.6%) were successful. In your English 126-8772 class, 36 students initially enrolled. Only 12 finished the class. Only seven (19.4%) were successful. In your English 175-2742 class, 50 students initially enrolled. Only 21 finished, and only 14 (28%) were successful. (Exhibit 38.)

105.     Your average success rate for Spring 2011 was approximately 24%. For the Fall of 2010, it was 17.7%; Summer of 2010, it was 20.7%; Spring of 2010, it was 11.9%; Fall of 2009, it was 14.2%; and Spring of 2009, it was 12.8%. Therefore, while you did improve your student success rate in the Spring of 2011, it is still 48% below the department average, which is unacceptable. (Exhibit 39.)

106.     Your management-initiated evaluation was completed on or about May 26, 2011. The Summary Evaluation Form noted four past management-initiated evaluations based on student complaints, and that you had been repeatedly directed since approximately 1994/95, to improve in the areas having to do with respecting students, not demeaning students, preparing a proper syllabus, habitual tardiness, and not giving back student work. The Form summarized student comments, including ongoing concerns about not returning work, starting and ending class on time, clear grading policies, and demeaning students. It was also noted that you failed to fully cooperate with the evaluation process by not providing Classroom Observation Forms, overt rudeness to Ms. Lamb, defects in your syllabi, and the fact that it appeared you were not adhering to Department requirements that students write a minimum of 6,000 graded words per semester in your 122 class. The form noted ongoing concerns with retention and overall student success. It was noted that you refused to submit a self-evaluation report. Additional information provided by the department chair included the fact that you consistently turned in your census rosters late, creating additional work for Administration & Records staff, and that this problem has been going on for several semesters. It was also noted that your conduct generates numerous

student complaints, and that you do not participate regularly in meetings, or other staff development activities.  (Exhibit 40.)

## F.    Ongoing Performance/Behavior/Attitude Issues

107.    As of March 31, 2011, you still had not submitted the required improvement plan, and had failed to respond to the request to have your bed removed from your office.

108.    As of March 31, 2011, you had not made any meaningful improvements in student retention or student success.  For example, in your English 118-8744 course, a nine-week course which had just ended, you started the class with 30 students, but only 16 students finished.  Fourteen withdrew.  Only seven students (or 23.3%) were "successful."  You gave seven Fs, two Ds, four Cs, three Bs and zero As.

109.    On April 12, 2011, you were issued another formal Letter of Reprimand, citing your insubordination on March 29, 2011, by ignoring the evaluation meeting time, failing to pick up certified letters sent to your home, failing to improve student retention and student success, and failing to remove the bed from your office after being directed repeatedly to do so by the District.  You were directed to select and notify the District of your faculty representative for the management-initiated evaluation and to remove the bed immediately, and to treat your supervisors with courtesy and respect.  (Exhibit 25.)

110.    While there were some minor revisions during the process, the District adhered to a management evaluation schedule.  (Exhibit 41.)

111.    On April 28, 2011, you sent an email to Peter Garcia claiming that your employment relationship was "not hierarchical," and you "directed" him to cite contractual authority for the District's actions.  In the next paragraph, you "directed" Mr. Garcia to "stop persistently mischaracterizing events," despite the fact that it was you who were guilty of this.  Without evidence, you accused him of "illegally" searching your office, and "directed" him to cite contractual authority for developing an improvement plan and changing your schedule.  The tone of your email was rude, disrespectful and insubordinate.  Mr. Garcia responded to your email on May 3, 2011, outlined the legal authority for his actions, and noted that you had still failed to remove the bed from your office.  (Exhibit 42.)

112.    A photograph of the bed in your office is attached hereto as Exhibit 43.

113.    On or about May 18, 2011, you were issued a formal letter of reprimand regarding your continuing underload and refusal to teach your assigned English 126-2754 class.  The letter also documented your failure to sign your absence reports and otherwise actively work to make up your underload.  You were directed to sign the absence reports or otherwise advise the District how you wished your absences to be recorded.  Lastly, the letter noted that you had failed to submit a self-evaluation, as required by the evaluation process.  (Exhibit 44.)

114.    In the Spring of 2011, you were advised multiple times that the College would not permit you to teach an evening class, and you were directed to replace that course with another. As of April 14, 2011, you had not contacted Ms. Kruse or Nancy Zink about selecting an

Paul Guess
Statement of Charges
005142.00172/321121v1

alternative course to replace the evening class. You were therefore unilaterally assigned an alternate class. (Exhibit 45.)

115.    Despite all of the previous warnings and directives, you were issued another Letter of Reprimand, dated May 27, 2011, for your inappropriate behavior at a meeting between you and District administrators held on May 26, 2011, to discuss the Summary Evaluation Form from your management-initiated evaluation. You took issue with the statement: "Observations were made difficult by the lack of Paul's full cooperation in the process and by his refusal to provide Classroom Observation forms. In one class when he was informed that student evaluations were to be conducted before the end of class, he taught ten minutes past the end of class, and the evaluator had to return to the next class. Then when the evaluator showed up at the beginning of class as agreed upon, she was told to return at the end of class." You claimed this statement was untrue and referred to the evaluator, DVC Vice President Susan Lamb, as a "liar," in violation of past directives and the specific directive given you in the April 12, 2011 Letter of Reprimand, to treat District administrators with respect. At the evaluation meeting, you threatened to get statements from students to prove your point, in direct violation of past directives not to use students that way. After being reminded of this directive, you stated you were going to do it anyway. Your comments were inappropriate and insubordinate. (Exhibit 46.)

116.    The bed was removed from your office on June 2, 2011, because you ignored repeated directives to have it removed yourself. The March 29, 2011 Letter of Reprimand, directed you to remove the bed in your office by April 8. The April 12, 2011 Letter of Reprimand, directed you to let the College know your wishes for the bed after its removal on April 18. You did not respond or act, constituting blatant insubordination.

117.    You have failed to comply with District policies and procedures, as well as California Code of Regulations regarding issuance of grades. For example, a student (Antoinette Blue-Tillman) received an "incomplete" on her transcript. She emailed you twice about the fact that she had not received her grade, and you failed to respond. The student had apparently turned in an assignment that appeared to be missing a couple of pages. Rather than contact her immediately about the missing pages and give her a chance to deliver them, or give her a D on the assignment, you simply gave her an "incomplete" without explanation. In addition, you failed to have the student sign the required "incomplete" form when you submitted the grades. The student must be put properly on notice as to what he/she is supposed to do in order to do to complete the course and receive a letter grade. As a result of your failure to follow correct procedures, the student was worried, and you caused administrators to have to spend their time trying to correct your errors.

## G.    **Impact on Departmental Morale**

118.    Students, faculty, and administrators have all complained consistently over the years about your aggressive, abrasive, rude and confrontational style. You regularly attempt to manipulate or intimidate others, regardless of their status as faculty, students, or superiors.

119.    For example, at a recent department meeting on March 16, 2011, the subject of student retention came up. It is well known in the department that due to your hostile demeanor

and unfair grading, students drop your classes at an alarming rate, causing cancellation of your classes. (Exhibit 47.)  This fact has had a detrimental impact on the department as a whole, because it resulted in several classes being cut.  In a defensive and aggressive manner, you claimed that if you maintained your standards, you were going to lose students, and implied that there was nothing you could do about this.  Other faculty suggested that there were other alternatives available to ensure student success and maintain student enrollment.  At one point, you attacked the speaker (Keith Mikolavich), and asked him in an accusatory tone, "Do you purport to be an ethical person?"  In so doing, you turned the discussion from one about student success into a personal attack.  Mr. Mikolavich was so offended by your outburst that he left the meeting.

120.    On or about March 2, 2011, another one of your colleagues, Lisa Orta, was conducting a workshop on accommodating disabled students.  There were approximately 25 students, faculty, and administrators present.  The presentation started with a film, and then went into a group discussion.  You arrived late.  During the discussion, Ms. Orta attempted to handle questions from students with different perspectives on accommodating students with disabilities.  For example, one student stated that he didn't understand why disabled students should be accommodated, because they held him back, and he was in college to learn to be more competitive.  Another student voiced support for granting accommodations.  Ms. Orta tried to explain how having disabled students in the classroom could actually assist him in meeting his goals of being more competitive in the workplace.  You then attacked Ms. Orta in how she answered the question and accused her of trying to favor one student's viewpoint over the others.  Your overall tone was hostile and accusatory.  Others found it so off putting that they sent emails to Ms. Orta sympathizing with her for having to put up with you.

121.    In the Spring of 2011, the departmental scheduling committee was meeting to establish the schedule for the fall semester.  You failed to submit a scheduling request on time.  In order to still try to accommodate your request, the committee asked the dean to call you to phone in your request.  The dean then reported to the committee that you were insisting on speaking directly to the committee and would not relay your request through the dean.  The committee then informed the dean that they would refuse to speak to you because they did not speak to any other faculty member and would refuse to grant you the special treatment that you seemed intent on getting.  In the end, you agreed to relay your request through the dean.

122.    Students regularly complain, in an informal manner, about you to other faculty.  Complaints are the same as those reported in the evaluations, i.e., demeaning and abusive tone, unfair grading, etc.

123.    You regularly fail to come to departmental and/or other meetings.  When you are present, many find your presence to be disruptive, and your tone and actions to be rude and insensitive.  When you are called on your behavior, you refuse to acknowledge the feelings of those you have offended and refuse to apologize.

124.    As a result of your abusive conduct and unfair grading, students drop your classes, sometimes requiring course cancellation, as described above. (Exhibit 47.)  Even when the courses are not cancelled, you frequently have far fewer students in your classes than your colleagues.  This in turn results in far less work for you as compared to your colleagues.  The

fact that you are responsible for grading far fewer papers, and do not attend meetings on a regular basis, creates the perception that you do far less work in the department than your colleagues and creates resentment and overall lowered morale.

125.    From your syllabi, it appears that you are not requiring students to write the required 6,000 total words for the semester as required for all English composition courses.  You are well aware that as a result of these word-count requirements and the recognition that the teaching and grading of the required assignments in composition courses constitutes a heavier work-load, you receive extra load credit.   However, by not enforcing the word-count requirements, not only are you depriving students of the benefit of the practice skills in writing, but you are also avoiding having to do the additional grading that would otherwise be required. You are jeopardizing articulation agreements that DVC maintains with the UC and CSU systems and other transfer schools in the area. You are weakening the case with the administration that instructors of composition courses deserve extra load credit and jeopardizing the Faculty Union's argument for the additional load for composition courses.    Your non-compliance with departmental standards and agreements with other colleges and with the union and the administration further damages the morale of the department.

## H.      Ongoing Insubordination/Failure to Comply With Directives

126.    As noted above, you repeatedly failed to have the bed removed from your office.

127.    As noted above, you refused to teach an assigned class, and refused to provide medical verification to cover your absence until much later.   You refused to sign absence verification forms as directed.

128.    Dating as far back as April 24, 1997, you were given specific directives to (1) teach your classes during the designated time periods; (2) not demean or embarrass students; (3) provide proper syllabi with a clear grading policy; (4) participate in department committees in a collaborative way in order to share in the responsibilities of departmental work and attend management-called division meetings; (5) adhere to department guidelines for number and length of student essays; (6) bring your grading standards into line with the rest of the English department and improve your student success rate; and (7) improve student retention. (Exhibit N).  Despite the fact that these directives have been reiterated repeatedly over the last approximately 15 years, you have consistently refused to comply.

129.    In the NUC/NUP given to you on February 3, 2011, you were given the following specific directives, which you have violated, as described above, and summarized below:

a.       Review/comply with District's policies and procedures related to sexual harassment and not engage in any discussion of sexual topics, or use of sexual language, without first discussing the matter with your supervising dean, to ensure that it complies with the curriculum.  As noted above, you brought up sexual topics in class (e.g., use of word "penis" and "breast") without advance permission.  In addition, you continued to use sexual and flirtatious language with female students (e.g., "beautiful baby" award, referring to student as "pretty in pink," etc.).

b.      Present copies of updated syllabi to your supervising dean prior to the start of the Spring 2011 semester, for all classes. The syllabi must contain the information required by District policy, including, but not limited to, your actual office location and office hours. Your syllabi must also contain your grading policy. You turned in all of your syllabi late. Three were turned in on February 7. The last one (English 122), was turned in approximately a month later. As described above, your syllabi continue to be wholly insufficient. They do not contain all required office hours, they contain multiple typographical and grammatical errors, and they fail to put students on notice of a detailed grading policy.

c.      Grade students according to standards that are appropriate for a community college. As noted above, the vast majority of students are not successful in your classes. They either drop out, or receive Ds and Fs. You have attempted to defend your grading policies on the grounds that the students do not meet your standards; however, you are well aware that you teach in a community college and that it is entirely appropriate to set standards appropriate for this particular academic institution. You may not unilaterally decide what the appropriate standards are.

d.      Not to use any language, tone, facial expressions, or other forms of communication that are or are likely to be perceived as insulting, demeaning, hostile, abusive or condescending; come up with positive strategies for engaging students and making the material more interesting. As described above, you continue to make demeaning and disparaging comments to students, colleagues and your superiors. Putting up your hand in an aggressive manner and yelling "stop" to students when you disagree with what they are saying is similarly in violation of this directive. Students still regularly complain about the lack of respect that they receive from you.

e.      Arrive to every class on time, and keep the class for the entire duration of the class period. As described above, student comments indicate that this is an ongoing concern. Moreover, during the formal observation process, you were observed keeping students well after class.

f.      Not to make any disparaging comments or take any disparaging action against students for their personal life choices. As noted above, you berated a student for her personal choice of giving her child the occasional swat as a behavior modification tool. This was inappropriate and in violation of this clear directive.

g.      Not to use any nicknames in class, for any reason. As noted above, you not only continued to use nicknames, but you informed your superiors that you never had any intention of complying with this directive. Even worse, you referred to Vice President Susan Lamb as "Suzie," in what appeared to be a deliberate attempt to demean her in front of students and to demonstrate your utter hostility for the previous directive.

h.      Prepare a professional improvement plan with specific strategies designed to increase student enrollment and retention in your classes, and a timeline for making up your existing underload. As noted above, you never developed such a plan, and never demonstrated any commitment to improving your performance.

i.       Not to engage in any behavior that is or could be perceived to be retaliatory.  If and when students complain about you in the future, you are not to try to defend your conduct directly to the student, or to the class as a whole.  You are not to take it out on students in any way if students express dissatisfaction, directly to you, or indirectly, through the administration. Despite these extremely clear directives, you berated and cross-examined student Margie Santoyo during a meeting with her to discuss her feelings, and attempted to make her look and feel even worse.

130.    In sum, you have violated practically all of the directives given to you in the NUC/NUP provided to you on February 3, 2011.

## I.      Application

A review of your personnel file indicates that the issues regarding your abusive and unprofessional conduct date back 15 years.  Student evaluations from 1994 and 1995, as well as student complaints dating from that era, show that you were insulting and ridiculing them at that time.  They were regularly complaining that you yelled at and intimidated them.   You were advised at the time that this sort of conduct was completely unacceptable.  As a result of ongoing offensive conduct, in April, 1996, the District initiated a management evaluation and notified you that there was evidence of (a) unprofessional conduct; (b) incompetency) and (c) evident unfitness for service.  (Exhibit K.)

Despite these warnings, your conduct did not improve.  In September, 1996, a student in your English 123 class reported that you continued to be abusive toward students, saying, for example, "read the fucking words!"  He also alleged that you kissed a female student's hand, telling a student that they were "garbage," and telling students that they were saying "stupid things."  Another student complained the same month about similar misconduct; for example yelling, "people who do not study should have bricks thrown at them!" as well as your habitual tardiness.  When you were advised by the administration to meet to discuss the management-initiated evaluation process, you refused to meet.  Nevertheless, the District commenced the process.  (Exhibit L.)  In November, 2006, you were advised that your student evaluations noted habitual lateness.  (Exhibit M.)  In March 1997, the District received an additional student complaint about your lateness, your syllabus, inadequate graded assignments, eating in class, expelling students from class for no reason, and abusive behavior, causing students to drop the class.  As a result of this continued misconduct, the management-initiated evaluation process was extended through the Spring 1997 semester.  (Exhibit N.)

Since that time, the District has continued to receive periodic complaints about your behavior, including allegations of discrimination.  Notably, according to your evaluation for Fall 2008, approximately 30% of your English 118 students felt that you discriminated on the basis of some protected classification.  (Exhibit O.)

Despite repeated directives, you have failed to correct your deficiencies.   You have overtly defied the valid authority of your superiors on multiple occasions, failed to comply with departmental and District policies and procedures, and have repeatedly behaved in a rude, disrespectful and defiant manner.  You have caused a deterioration of morale in your department, and have caused hundreds of students over the years to be discouraged, disparaged and

Paul Guess
Statement of Charges
005142.00172/321121v1